BAUMGARTH *v.* FIREMEN'S FUND INSURANCE CO.[1]

1. FIRE INSURANCE—ACTION ON POLICY—APPRAISAL—NECESSITY. No right of action on the part of one insured against loss by fire exists until an appraisal provided for in the policy has been made.

2. SAME—APPRAISERS—UMPIRE—SELECTION—NECESSITY. Where appraisers appointed under the terms of a fire insurance policy agreed upon an umpire, who agreed to act if his physician would let him, there was no occasion for any further action until satisfactory assurance was had that the person chosen could not act; and the action of the insured thereafter in selecting an umpire, appraising the loss, and bringing suit upon the policy was premature.

Error to Arenac; Sharpe, J. Submitted February 24, 1908. (Docket No. 124.) Decided May 1, 1908.

Assumpsit by Morris C. Baumgarth and Rudolph Baumgarth, copartners as Baumgarth Bros., against the Firemen's Fund Insurance Company on a policy of insurance.

[1] Rehearing denied June 27, 1908.

There was judgment for plaintiffs, and defendant brings error.   Reversed.

*Alfred Lucking* (*George B. Yerkes* and *Benjamin Henderson*, of counsel), for appellant.

*Weadock & Duffy*, for appellees.

This suit is brought upon an insurance policy to recover the amount of a loss by fire.   The property insured was a stock of goods.   The policy, a standard policy provided by the law, contained the following provision:

" In the event of disagreement as to the amount of loss the same shall, as above provided, be ascertained by two competent and disinterested appraisers, the insured and this company each selecting one, and the two so chosen shall first select a competent and disinterested umpire; the appraisers together shall then estimate and appraise the loss, stating separately sound value and damage and, failing to agree, shall submit their differences to the umpire; and the award in writing of any two shall be prima facie evidence of the amount of such loss; the parties thereto shall pay the appraisers respectively selected by them, and shall bear equally the expense of the appraisal and umpire."

The policy further provided that no suit should be sustainable upon it until this requirement was complied with. After the fire the defendant was notified of the loss.   It sent its adjuster to make an examination.   An agreement of the amount of the loss was found impossible, whereupon the parties signed a non-waiver agreement to the effect that proceedings under the appraisement should not waive any of the rights of either party.   The plaintiffs selected one Dickson as its appraiser and the defendant one Thomas.   Dickson resided in Detroit, and Thomas in Chicago.   They met at Standish, the home of the plaintiffs, and commenced negotiations for the appointment of an umpire, or third party.   Those proposed by each appraiser were rejected by the other.   Finally one Weaver, a merchant of Standish, was agreed upon.   Both of the appraisers interviewed him.   Mr. Weaver con-

sented conditionally. He was not very well; was going to Detroit to consult a physician and informed them that if the doctor would allow him to come back he would come back and act. This conditional agreement was evidently made by Mr. Weaver on the day before, Mr. Dickson, assuming that Mr. Thomas had refused to proceed further with attempts to procure a third appraiser, broke off further negotiations and by the advice of plaintiffs and their attorney procured another appraiser to act with him and proceeded the next morning to appraise the damage. This was evidently on October 2d, and on that day Mr. Weaver went to Detroit.

Mr. Dickson testified on direct examination:

" *Q.* What was there to Newton B. Weaver ?
"*A.* Mr. Weaver wouldn't act.
" *Q.* Was he proposed ?
"*A.* Yes, sir.
" *Q.* Accepted ?
"*A.* Yes, sir.
" *Q.* And what did he do with reference to acting ?
"*A.* Refused to act."

Mr. Dickson further testified that on the 3d he and Mr. Thomas had a conversation which he details as follows:

"I says, ' Mr. Thomas, Mr. Weaver shan't act, he won't act.'
" *Q.* I didn't get that.
" *A.* I said Mr. Weaver claims that he won't act.
" *Q.* You told Mr. Thomas he said he wouldn't act ?
" *A.* Yes, Mr. Thomas was satisfied that he would act. I had been informed that he wouldn't under any circumstances. I asked if he had any more names to propose. No. He wouldn't take any more, because he had his third man, Mr. Weaver. Mr. Weaver went down to Detroit. And I finally to satisfy myself telegraphed, or at least had Mr. Baumgarth to telegraph to Mr. Weaver and Mr. Weaver returned a message as follows:

" ' Detroit, Michigan, Oct. 3, 1906.
" 'Baumgarth Brothers,
" 'Standish, Michigan.
" ' Unable to say when can go home.
" ' N. B. Weaver.' "

He further testified that he informed Mr. Thomas, after receiving this telegram, that Weaver could not be there, and that Mr. Thomas was satisfied that he would attend as he said Mr. Weaver promised that he would. Outside of the telegram which Mr. Dickson received from Mr. Weaver, the only information he had was from Mr. Weaver's son who he said assured him (Dickson) that his father could not serve. Mr. Thomas then saw Mr. Chamberlain, defendant's local agent, and Mr. Chamberlain telegraphed to Mr. Weaver as follows:

"You are the only one we can agree upon for umpire. Wire yes or no. Please accept."

Mr. Weaver received that telegram in the evening. He did not wire an answer, but wrote to his son to tell Mr. Chamberlain that he wouldn't be able to act. The telegram which Mr. Weaver sent to Mr. Dickson reads as follows:

"Unable to say when can go home."

On the morning of October 4th, learning that Dickson and another man were proceeding to appraise the damages, he wrote to Mr. Dickson the following letter:

"Referring to appraisal of Baumgarth Bros., beg to say that inasmuch as we have agreed upon Mr. N. B. Weaver as umpire, I am ready to sign appraisal papers on him at once, in order to preclude any further delay and proceed at once with our duties. If we fail to agree upon any item, or items, we can let same stand until such time as Mr. Weaver can pass upon them. If this is not satisfactory, I will renew my proposition to accept for umpire any person whom the circuit judge of this circuit will name. I do this for the purpose of expediting matters and to get this matter disposed of at once. If either of these propositions are not satisfactory to you, I will meet you in any city in Michigan that you may suggest for the purpose of selecting a competent and disinterested umpire. My address for today is Hotel Ryland, Standish, Michigan. After today, No. 6420 Greenwood ave., Chicago, Illinois.

"Awaiting your early advices, I am," etc.

. This letter closed the negotiations between Dickson and Thomas for an appraisal.

GRANT, C. J. (*after stating the facts*). It is the established rule in this State that no right of action on the part of an insured exists until an appraisal provided for in the policy has been made. *Chippewa Lumber Co.* v. *Insurance Co.*, 80 Mich. 116; *Morley* v. *Insurance Co.*, 85 Mich. 212; *Kersey* v. *Insurance Co.*, 135 Mich. 10.

The parties to this suit recognized this rule and each selected an appraiser in accordance with its terms,—Mr. Dickson for the plaintiffs, and Mr. Thomas for the defendant. They met. Each proposed several names, none of which was satisfactory to the other. They finally agreed upon Mr. Weaver. He agreed to return and act if his physician would permit. Neither was obliged to take any further action until he had satisfactory assurance that Mr. Weaver would not act. Mr. Dickson assumed to act upon information received from Mr. Weaver's son. He was not justified in relying upon this and could not place Mr. Thomas or the defendant in the wrong until Mr. Thomas knew of Mr. Weaver's refusal. Dickson did not rely upon the assurance received from Weaver's son, for he telegraphed to Mr. Weaver at Detroit, and received not a refusal but a telegram saying:

" Unable to say when can go home."

Under Dickson's own testimony Mr. Thomas, in the conversation of the 3d of October, informed him that he was satisfied Mr. Weaver would act. Thomas testified that about 4 o'clock on the afternoon of the 3d, Dickson informed him that he was going to take an ex parte appraisal. I do not find this statement contradicted by Mr. Dickson.

No one knew of Weaver's refusal until the letter received by his son sometime on the 4th of October. Mr. Dickson had no information upon which the law required him to act until the 4th of October. At that time, Mr.

Dickson, acting under the instruction of the plaintiffs and their attorney, had commenced an ex parte appraisal, at nine o'clock on the morning of the 4th. As soon as Mr. Thomas knew this he wrote the letter above quoted offering to continue negotiations. To this letter plaintiffs paid no attention. Mr. Dickson claims that he acted in good faith in proposing persons for umpire, though he mentioned some persons who were relatives of the plaintiffs and another who was in the employ of a relative. Mr. Dickson objected to the persons proposed by Thomas, none of whom it appears was in any manner connected with the defendant or its business. The refusal on the part of Thomas to approve the persons named by Mr. Dickson is not of itself any evidence of bad faith under the reasons given by him. The plaintiffs through Dickson were in the wrong in refusing to make further attempts to select an umpire, after they had learned that Mr. Weaver could not act. There is no occasion to enter into a discussion of the charge of bad faith on the part of Mr. Dickson. I can find no evidence of bad faith on the part of Mr. Thomas. If it were the fact that both arbitrators acted unreasonably and had concluded that they could not agree, there being no bad faith on the part of the defendant, the plaintiffs had not fully performed their legal duty under their contract. It was their duty to continue further negotiations to secure an appraisal.

In *Vernon Ins. Co.* v. *Maitlen*, 158 Ind. 393, the facts were very similar to those in this case. Each chose his arbitrator. One insisted that the umpire should be a resident of the immediate vicinity of the place where the property was situated, the other that he should be taken from some point not in the immediate vicinity. The court say:

" The appraisers seem to have been equally honest, and equally unreasonable in their views concerning the proper qualifications of an umpire. Those views proved to be irreconcilable. It cannot be said that one of the parties, more than the other was responsible for the failure to

agree upon an umpire. We cannot attribute bad faith or perversity to either. We must ascribe their failure to agree, rather, to the peculiarities of the two appraisers. Other appraisers, if chosen, may easily decide the amount of the loss, or, in case of a difference of opinion on this point, may promptly select an umpire.".

It was held that the condition of arbitration was still binding upon the parties, that they should have appointed new arbitrators, and that the insured could not maintain a suit. Under similar circumstances the supreme court of Iowa made the same ruling. *Westenhaver* v. *Insurance Co.*, 113 Iowa, 726; *Altman* v. *Altman*, 5 Daly (N. Y.), 436; *Davenport* v. *Insurance Co.*, 10 Daly (N. Y.), 535.

It follows that plaintiffs were not in position to maintain this suit, and the trial court should have so instructed the jury.

There was an incumbrance upon a portion of this stock of goods claimed to constitute a chattel mortgage and to vitiate the policy. Under the above disposal of the case, it is unnecessary to determine that question.

Judgment reversed, and new trial ordered.

HOOKER, MOORE CARPENTER, and McALVAY, JJ., concurred.