## FROLICH *v.* WALBRIDGE-ALDINGER CO.

1. ARBITRATION AND AWARD—AGREEMENT FOR ARBITRATION NOT IN CONFORMITY WITH STATUTE PROVIDED FOR COMMON-LAW ARBITRATION.

   A provision in a contract for arbitration in case differences arose, although not in conformity with statutory requirements (3 Comp. Laws 1915, § 13646 *et seq.*), is an agreement for a common-law arbitration.[1]

2. SAME—WHETHER EFFORTS TO COMPLY WITH ARBITRATION REQUIREMENTS WERE SUFFICIENT A JURY QUESTION.

   In an action for a claimed balance due on a contract for the furnishing and glazing of glass, where the contract provided for the settlement of differences arising by arbitration, testimony as to plaintiff's unsuccessful efforts to

[1]Arbitration and Award, 5 C. J. § 42.

have his claim settled by arbitration, *held*, sufficient to authorize submitting to the jury the question as to whether he had sufficiently complied with the contract provision for arbitration as to authorize his bringing this action.[2]

3. TRIAL—APPEAL AND ERROR—DIRECTED VERDICT.
Requests to charge which amounted to a directed verdict in favor of defendant on the questions involved were properly denied, where there was testimony sufficient to carry said questions to the jury.[3]

4. EVIDENCE—INVOICES PROPERLY IDENTIFIED ADMISSIBLE.
Where plaintiff had been permitted to introduce invoices of glass purchased for use in fulfilling his contract with defendant, some of which was not used because of alterations in the plans, it was error to deny defendant the right to introduce invoices of special glass with proof of payment by it in support of its claim that said glass was used by plaintiff but never credited to defendant.[4]

Error to Wayne; Jayne (Ira W.), J.    Submitted January 15, 1926.    (Docket No. 13.)    Decided October 22, 1926.

Assumpsit by Edward Frolich, doing business as the Frolich Glass Company, against the Walbridge-Aldinger Company, for a balance due on a contract for the furnishing and glazing of glass.    Judgment for plaintiff.    Defendant brings error.    Reversed.

*Francis L. Sward* (*Frederick B. Brown*, of counsel), for appellant.

*S. Homer Ferguson*, for appellee.

STEERE, J.    On April 8, 1916, defendant contracted to construct a large building on Washington boulevard in the city of Detroit, known as the Book building. On May 10, 1916, it let a subcontract to plaintiff, Frolich, for furnishing glass and doing the glazing in said building, "except paragraph No. 377—Dome

[2]Arbitration and Award, 5 C. J. § 72; Contracts, 13 C. J. § 1015; [3]Trial, 38 Cyc. p. 1567; [4]Appeal and Error, 4 C. J. § 2986; Evidence, 22 C. J. § 1027 (Anno).

Light," according to plans and specifications of the architect as they appeared in the original contract, the agreed price therefor being $17,500. The contract is in writing, elaborately drawn, with numerous detailed provisions and references to the original contract. As the work progressed alterations were directed by defendant from time to time and extras ordered as authorized by the contract. Many of them are unquestioned by the contractor. Under the original contract the building was to be completed by January 1, 1917, but it was not and the record shows work being done upon it for nearly a year thereafter. After the building was completed attempts were made by the parties to this contract to reach a settlement as to the various alterations, extras, delays, etc., which intervened during its performance. Many of the items which had been questioned were agreed upon, but protracted differences arose as to others which ultimately became the subject-matter of this litigation.

Plaintiff commenced this suit by declaration in assumpsit filed February 28, 1922, declaring in a special count on its contract for full performance, and extra work done, alterations made, material furnished at the instance of defendant, etc., stated with considerable detail, also declaring upon the common counts. A bill of particulars was demanded and furnished stating the contract price, and showing in detail items for alterations, temporarily installed glass, overtime, breakage, differences in sizes of glass and other extras amounting to $4,824.03. An amendment to the bill of particulars also appears in the record, without date, adding an item of $667.62 for polished plate glass furnished defendant, making the amount for extras claimed under plaintiff's declaration $5,491.65, which, added to the contract price, would make plaintiff's total charge, under and in connection with the contract,

$22,991.65. Payments amounting to $19,700 were credited on this in the bill of particulars, the amount claimed yet due being $3,291.65 with interest. On November 22, 1922, defendant filed its plea of the general issue with special notice of counterclaims, including work done for plaintiff, damages done by plaintiff to sill, cost of replacing stops, glass and other claimed credits amounting to $2,347.45, alleging that such claims would be urged by way of recoupment against the demand of the said plaintiff. On November 28, 1924, defendant, under its plea of general issue, filed a further notice that it would give in evidence and insist in its defense that no proper effort had been made by plaintiff to have its claims submitted to arbitration as required by the contract, which was a condition precedent to the commencement of suit. That point was pressed for defendant during the trial as the controlling question in the case, and conceded to be so if defendant's contention that fact stood undisputed was tenable. The court was requested to dispose of it as a matter of law under the testimony, but submitted it to the jury as a question of fact. Error is assigned upon such ruling and prominently argued in briefs of counsel.

Possible deviations from the strict provisions of the contract are anticipated in several of its articles and damages to one or the other of the parties in such event are authorized to be computed and determined by the architect or agreement of the parties, but in case of the architect's failure to act or disagreement of the parties the matter "shall be referred to arbitration as hereinafter mentioned." The material provisions thereafter mentioned upon that subject are as follows:

"Article XV. Any arbitration herein provided for shall be as follows: The subcontractor and contractor shall each appoint one arbitrator and such arbitrators shall appoint a third. The decision of any two of the

three arbitrators shall be final and binding.   *   *   *
A party who has not appointed an arbitrator after the
other party has appointed one shall do so within two
days after being notified in writing by such other party
to do so.    If the arbitrator of either party shall fail
to proceed with the consideration of the matters within
three days after being requested in writing by the
other party's arbitrator so to do, such other party's
arbitrator shall, if a third has not been appointed, be
at liberty to act as sole arbitrator and his decision shall
be final and binding, or the other two arbitrators, if a
third has been appointed, may forthwith appoint an
arbitrator in lieu of the one who has failed to pro-
ceed as aforesaid, and the decision of two of such
three arbitrators shall be final and binding.    If either
party has done all in his power to comply with the
provisions herein contained as to securing an arbitra-
tion, but by reason of the default of the other party
or of the said architects or of the arbitrator appointed
by such other party or by reason of the architects
failing to certify in respect of any matter or thing
upon which he should under the terms hereof ad-
judicate or render certificate   *   *   *   such party
may take such action as would be permissible in the
courts in the same way as if no reference of the matter
in question either to the said architects or to arbitra-
tion had been herein provided for and the other party
shall not be at liberty to object that the adjudication
of the architects or a certificate from them is pre-
requisite or that the remedy is only by arbitration or
that arbitration is a prerequisite to such action being
taken.   *   *   *   An award under the provisions of
this article may be made a rule or judgment of any
proper court in the State of Michigan."

This article is not in conformity with our statutory
requirements (3 Comp. Laws 1915, § 13646 *et seq.*)
and makes no reference to the act, but in any event it
is an agreement for a common-law arbitration.

When tenacious differences arose in their attempts
to settle, arbitration was proposed by plaintiff and
tentatively consented to by both parties, but defend-
ant failed to name an arbitrator.    Frolich testified

that he talked with defendant's officers about arbitrating and named as his arbitrator, to both its vice-president, Walbridge, and secretary, Lewitt, a Mr. Morgan who was then doing some work for defendant, telling them that as Morgan was familiar with the building and the glass business plaintiff was willing to have him act as his arbitrator, and he then prepared data for the purpose of an arbitration which he submitted to defendant. On his counsel's showing him a writing just received from defendant's counsel, he was asked, "whether or not that is the notice you gave to them?" and answered, "It is." Its admission in evidence was objected to as "a self-serving declaration" and the objection sustained. Walbridge was asked on direct-examination if he ever received from plaintiff any request or demand for an arbitration, to which he answered, "There was something mentioned in a letter I received a long time ago. I have forgotten what it is, though." On cross-examination he was asked and answered:

"*Q.* Well, have you got the letter you did get?
\* \* \*
"*A.* I don't know. We talked about arbitration and settlement fifty times and I was willing to do anything to settle this case.
"*Q.* Did you name an arbitrator?
"*A.* No, sir, I don't think so.
"*Q.* You did not?
"*A.* No, I know I didn't. \* \* \*
"*Q.* Mr. S—— (his attorney) was authorized to act for you?
"*A.* Yes.
"*Q.* And anything he did or any notice he received he would accept as binding on you?
"*A.* He should have I guess.
"*Q.* In this matter?
"*A.* He should."

It was also shown by plaintiff's evidence that Frolich authorized his attorney, Mr. F——, to represent him

in the matter of settlement and arbitration, and later appointed him as his arbitrator.   The controversy seems to have dragged along for some time in the hands of the attorneys for the respective parties who had quite a number of meetings and at different times discussed arbitration.   Plaintiff's attorney testified that he

"spoke to Mr. Walbridge in his office and he said it was entirely out of his hands, that I could take it up with Mr. S——, and I told Mr. Walbridge, we would appoint an arbitrator.

"*Q.* Did you tell Mr. Walbridge that you had been appointed as an arbitrator?

"*A.* Yes, that Mr. Frolich said I would act as an arbitrator.  *  *  *

"*Q.* Mr. S—— told you he would not act because he was an attorney?

"*A.* No, he never did."

He also testified defendant's attorney suggested himself as arbitrator, which was satisfactory, and he told defendant's attorney plaintiff had appointed him as arbitrator, after which he tried unsuccessfully to get a third arbitrator selected.   Defendant's attorney positively denied being told by plaintiff's attorney that Frolich had named him as one of the arbitrators, and testified that he never suggested or consented that he himself would act as such, but positively, and ethically, refused because of his professional connection with the case.   On January 6, 1922, plaintiff's attorney wrote defendant's attorney as follows:

"*Dear Sir:*   A long time ago, I suggested to you the appointment of John N. Morton, vice-president and cashier of the Commercial State Savings Bank as a third arbitrator in the above matter and Mr. Frolich now is very anxious to have this matter settled.

"Should I not hear from you on or before the 10th day of January, 1922, I shall consider that you desire to have the matter determined by the court of law and shall proceed in that manner.

"I am mailing a copy of this letter to your clients in order that they may have an official notice of our determination to proceed by an action at law."

To this defendant's attorney replied on January 10, 1922:

*"Dear Sir:*

"*Re:* Frolich *v.* Walbridge-Aldinger Co.

"I have your letter of January 6th, which, however, was not delivered to this office until yesterday morning. I note that you are putting a time limit of to-day on the matter of your starting suit. I am of course not suggesting to you one way or another whether you shall start suit or not. If you and your client are inclined to do so we are willing to submit the matter to arbitration to arbitrators other than you and myself. I think it can avail us nothing by simply selecting the third person, inasmuch as you and I have both definite ideas on the liability of the respective parties."

It is conceded defendant never appointed an arbitrator. After waiting over six weeks longer plaintiff began this action. If his proofs as to what was said, agreed upon, done and not done, relative to arbitration by the parties to this suit or their authorized agents are true, after giving the above notice plaintiff had sufficiently complied with the arbitration requirements to authorize bringing this action. There was no error in the court submitting that issue to the jury.

The trial resulted in a verdict with judgment in plaintiff's favor for $4,426.16, being a few cents more than the entire amount plaintiff claimed with interest added. Motion for a new trial was made on various grounds, including the claim that the verdict was unreasonable, excessive and contrary to the great weight of evidence. This motion was denied on plaintiff's remitting from the judgment $93.35, deducted from the item of $133.35 in plaintiff's bill of particulars for Sunday overtime, the court saying in part:

"Since it is obvious that the jury rendered a verdict in the entire amount claimed for the plaintiff, and eight cents more, probably by error of computation, the verdict for this reason should be reduced $93.35."

Aside from the question of arbitration, defendant's assignments of error are argued under the following headings:

"(1) The court erred in refusing the defendant's request to charge relative to breakage item ($63.85).

"(2) The court erred in refusing defendant's request to charge relative to item for Sunday overtime ($133.35).

"(3) The court erred in refusing defendant's request to charge relative to item for temporarily installed glass ($111.90).

"(4) The court erred in refusing defendant's request to charge relative to credit for glass and glazing omitted ($1,689.86)."

The last request is directed to a credit claimed by defendant for the value of extra glass it furnished under the changed plans, which plaintiff had not procured. The court was requested to charge the jury to deduct that amount from plaintiff's contract price. These four refused requests are in substance requests for a directed verdict in defendant's favor as to each of the items named. There was some testimony to carry all four items to the jury, and especially the first three which may be passed without further consideration. But as to the fourth and last item, urged as a credit by defendant, error is assigned on the court's ruling in curtailing defendant's testimony by excluding certain invoices of glass claimed to have been bought and paid for by defendant and put into the Book building, but not properly credited by plaintiff. This is spoken of in the charge as a claim for recoupment. In denying defendant's motion for a new trial the court said in reference to the ruling complained of:

"It is difficult to understand this contention in the light of the defendant's position repeatedly asserted that they abandoned all claims for recoupment, which position was stated to be the position of the defendant, to the jury, with the defendant's entire approval."

As appears in the record from their discussion during the trial of whether arbitration was an issue for the jury, the position of defendant's counsel was that they made no claim for recoupment,

"If the jury should decide that the provisions of arbitration have not been complied with, that is, if the plaintiff has come into court too soon on his claim as not having complied with the arbitration part of the agreement, then we are both out of court until the arbitration part of the agreement has been complied with."

If they were both in court, defendant had the right in its defense to show failure of plaintiff to give credit for work done or material furnished by defendant for the contract which it was plaintiff's duty to do and furnish.    To that end defendant had the right to show that it furnished and paid for different or extra glass required to meet alterations provided for in the contract and acquiesced in by plaintiff, which was "not furnished by said plaintiff, nor credited to the account of this defendant."    During the protracted performance of this contract the credits and debits between the parties were an open account.    If either party kept regular book accounts in relation to it they failed to produce their account books or offer them in evidence so far as this record shows, although a generous abundance of pen, pencil and typewritten matter consisting of letters, orders, bills, plans, statements of account, memoranda, etc., was produced.    Some of these were introduced in evidence and marked as exhibits while others are not shown to have been offered. Neither do all numbered exhibits appear in the printed record.    Examination of witnesses, both direct and

cross, jumps at times in a disjunctive way from one of the items to another with reference to different papers, rendering the examination on such occasions difficult to follow in the printed record. As it presents itself here, this trial runs in details of testimony similar in various respects to an accounting between the parties. Touching the debits and credits relative to glass which it was the duty of plaintiff to furnish under the contract, he broadly stated that he furnished all the glass, paid for it and gave defendant credit for glass returned after temporary use or because of authorized alterations. He also testified:

"The glass furnished was listed at $11,558.24. The contract calls, as the plans show, $8,555.58, making a net difference of $3,500 on account of the price and with the discount off and the glazing made $627."

The belated item in his amended bill of particulars amounting to $667.62 was also urged in that connection. Defendant's vice-president, Walbridge, testified that because of plaintiff's delays he bought from the Toledo Plate Glass Company and paid for all the glass that went into the Book building called for by alterations in the plans, amounting to $3,800, and he knew it was according to the invoices received from the Toledo Plate Glass Company and payments paid by defendant "because I was on the job pretty nearly every day, all the time at that time, and I handled this thing personally." Upon this item defendant claimed a balance not credited it by plaintiff amounting, as stated in the request of its counsel, to $1,689.86. As tending to sustain this contention defendant's counsel produced the invoices for glass sent to and paid for by defendant and used in the Book building, as its evidence showed. Defendant's secretary, who said he had charge of defendant's books and records during performance of this contract, testified that they were invoices of glass received from the Toledo Plate Glass Company for

glass furnished in the main Book building, they were original records of which he had charge and he knew that they were "the bills rendered by the Toledo Plate Glass Company, and paid by the Walbridge-Aldinger Company." The court allowed proof of their identification over persistent objections but sustained plaintiff's objection to their admission because hearsay, not the best evidence and incompetent.

Plaintiff had introduced long invoices or lists of many sizes and different kinds of glass claimed to have gone into the Book building, or been purchased for it but not used because of alterations of the plans. His bill of particulars contains three printed pages of "Extras" commencing "2 pp. 21x57; 2 lts 50x28¾" and so on with variations of number, kind and size such as "12 lts 24x34; 8 lts 24x34; 5 lts 24x34; * * * 4 lt 28x66 Imp. Prism; 15 lt 28x66 Imp. Prism; 2 lt 60x28¾" concluding with "2 60x52 Polished Plate; 1 44x60 Polished Plate." No witness could or assumed to testify in detail as to the various numbers, sizes, kinds and amounts of glass from memory independent of reference to some list or written memorandum. Those identified invoices were shown by defendant's evidence to be for glass which went into the Book building, ordered and paid for by defendant. Plaintiff's somewhat confusing testimony as above quoted was that extra glass by reason of changed plans made a net difference on account of the contract price with the discount off, of $3,500, while Walbridge testified the cost of this extra glass which went into the Book building was $3,800. On that he claimed an uncredited balance yet due defendant, as stated in its request to charge, of $1,689.86. The identified invoices with proof of payment and that the glass they related to went into the building would apparently throw some light on the contention of the parties and aid the court, or jury, in getting at, as

defendant's counsel claimed, "just where the difference is," and at least be admissible as tending to show the reasonableness of defendant's testimony on that issue. As applied to the situation shown here, its exclusion was prejudicial to a fair, full, and impartial trial of that issue, and beyond a reasonable exercise of discretion by the trial court.

The judgment is reversed, with costs to defendant, and a new trial granted.

BIRD, C. J., and SHARPE, SNOW, FELLOWS, WIEST, CLARK, and MCDONALD, JJ., concurred.