**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:  
Clifford W. Taylor

Justices:  
Michael F. Cavanagh  
Elizabeth A. Weaver  
Marilyn Kelly  
Maura D. Corrigan  
Robert P. Young, Jr.  
Stephen J. Markman

FILED MAY 4, 2006

WOLD ARCHITECTS and ENGINEERS,

     Plaintiff-Appellee,

v                                    No. 126917

THOMAS STRAT and STRAT and
ASSOCIATES, INC.,

     Defendants-Appellants.

_____

BEFORE THE ENTIRE BENCH

KELLY, J.

We granted leave in this case to determine: whether "common-law" arbitration should be deemed preempted by the Michigan arbitration act (MAA), MCL 600.5001 *et seq*. and, if common-law arbitration continues to exist, (1) what language must be included in an agreement to make it subject to the rules of statutory arbitration; (2) whether common-law arbitration agreements should be unilaterally revocable; and (3) whether the arbitration in this case, if it was common-law arbitration, became statutory arbitration because of the conduct of the parties during the arbitration process.

We hold that common-law arbitration is not preempted by the MAA and that common-law arbitration continues to exist in Michigan jurisprudence. In addition, common-law arbitration agreements continue to be unilaterally revocable before an arbitration award is made. And the common-law arbitration in this case was not transformed into statutory arbitration because of the conduct of the parties during the arbitration process.

We affirm the Court of Appeals determination that the trial court erred in granting defendants' motion for summary disposition and in denying plaintiff's motion to vacate the arbitration award.

THE UNDERLYING FACTS

In June 2000, plaintiff Wold Architects and Engineers, an architectural engineering firm, entered into an agreement to purchase the assets of defendant Strat and Associates, Inc. (Strat, Inc.), an architectural firm specializing in government and institutional work. Defendant Thomas Strat (Strat) is the sole owner of Strat, Inc. As part of the purchase agreement, Strat entered into a five-year employment agreement with Wold. Under the agreement, he was expected to develop business and consult. His compensation was based primarily on the profitability of Wold's Troy, Michigan, office. The employment agreement included an arbitration provision:

> The parties agree to submit any disputes arising from this Agreement to binding arbitration. The arbitrator shall be selected through the mutual cooperation between the representatives or counsel for the respective parties, failing agreement on which may be referred by either party to the Detroit Regional Office of the

2

American Arbitration Association for appointment of an arbitrator and processing under their Voluntary Labor Arbitration Rules. [Employment/Incentive Compensation Agreement, p 5.]

The asset purchase agreement, unlike the employment agreement, did not include an arbitration agreement. The purchase agreement transferred, among other assets, the renovation then in progress of the Macomb County courthouse. At the time of contracting, Strat, Inc. had already billed the county for 53 percent of the total project fee. Wold's senior accounting staff carefully reviewed the books and status of the project. Also, Wold had the opportunity to inspect the status of the project.

After the parties entered into the purchase agreement, Wold concluded that, rather than 47 percent of the project remaining in need of completion, 70 percent was incomplete. It began to withhold payments due under the employment agreement on the basis that Strat, Inc. had overstated the percentage of completion of the courthouse project and other projects.

Strat filed a demand for arbitration with the American Arbitration Association (AAA) on January 22, 2002, claiming that Wold owed him payments under the employment agreement. The AAA wrote both parties on February 12, 2002, indicating that its commercial dispute resolution procedures would govern all disputes rather than the voluntary labor arbitration rules specified in the contract. The AAA made the change because it deemed the commercial dispute procedures more apt for the situation at hand. They state that judgment on the arbitration award may be entered in the circuit court. The parties did not agree to

3

this change in writing, and no writing signed by the parties exists that contains such a provision.

In March, Wold filed a counter-demand for arbitration claiming that Strat had billed too much for the courthouse project. The parties then selected an arbitrator who held a prehearing conference in July. Document exchanges and witness disclosures followed. Wold agreed to an administration schedule that included an evidentiary hearing in October 2002.

Wold sent letters to the AAA in August and September questioning the scope of the arbitration. On October 8, it revoked its agreement to arbitrate, claiming that Strat had asserted claims that more properly fell under the asset purchase agreement, which contained no arbitration clause. It objected to use of the employment agreement arbitration clause because it created "a mess here that needs to be cleaned up."

On October 11, the arbitrator decided that the arbitration hearing would proceed as scheduled. It was his opinion that the arbitration that was agreed to in the employment agreement could not be revoked unilaterally.

Wold filed the instant action in Oakland Circuit Court seeking a declaratory judgment that (1) the pending arbitration was invalid because the asset purchase agreement did not contain an arbitration provision, and (2) the arbitration provision in the employment agreement was unilaterally revocable because it lacked the requisite language to be a statutory agreement that is nonrevocable. The complaint alleged that defendants either negligently or innocently

misrepresented the extent of the completion of the courthouse project, which amounted to fraud in the inducement. Wold also requested a preliminary injunction to prevent the scheduled arbitration.

At a hearing, the circuit court denied Wold's motion to enjoin the arbitration and for summary disposition. It found that each of the claims submitted to the AAA could be arbitrated without irreparable harm to Wold. It ruled that the parties had included in their agreement all language required to qualify for statutory arbitration.

The arbitration proceeded as scheduled. On November 27, the arbitrator issued an award of $104,559.27 to Strat and declared, "This award is in full settlement of all claims and counter-claims submitted to this arbitration. All claims not expressly granted herein are hereby denied."

Defendants then brought a motion in circuit court for summary disposition pursuant to MCR 2.116(C)(10). They contended that there was no longer a genuine issue of material fact concerning whether the parties had entered into a valid arbitration agreement. Wold moved to vacate the award, claiming that it had revoked the agreement to arbitrate.

The trial court granted defendants' motion for summary disposition and denied Wold's motion to vacate the award. Wold appealed to the Court of Appeals, contending, among other things, that the trial court had erred in finding that the employment agreement provided for binding statutory arbitration. The Court of Appeals held that the trial court had erred in enforcing the common-law

5

arbitration agreement that Wold had revoked before the award was announced. Accordingly, the Court of Appeals reversed the judgment of the trial court and remanded the case for further proceedings. *Wold Architects & Engineers, Inc v Strat*, unpublished opinion per curium of the Court of Appeals, issued June 17, 2004 (Docket No. 246874). We granted leave to appeal. 472 Mich 908(2005).

## STATUTORY ARBITRATION

We review a trial court's determination regarding a motion for summary disposition de novo. *Fane v Detroit Library Comm*, 465 Mich 68, 74; 631 NW2d 678 (2001). This case presents questions of law that are also reviewed de novo. *American Alternative Ins Co, Inc v York*, 470 Mich 28, 30; 679 NW2d 306 (2004).

Michigan has long recognized that a distinction exists between statutory and common-law arbitration. *Clement v Comstock*, 2 Mich 359 (1852); *F J Siller & Co v Hart*, 400 Mich 578, 581; 255 NW2d 347 (1977), citing *Frolich v Walbridge-Aldinger Co*, 236 Mich 425, 429; 210 NW 488 (1926). Statutory arbitration is provided for in MCL 600.5001 *et seq*. In order for an agreement to qualify for statutory arbitration, it must meet certain requirements:

> (1) All persons, except infants and persons of unsound mind, may, by an instrument *in writing*, submit to the decision of 1 or more arbitrators, any controversy existing between them, which might be the subject of a civil action, except as herein otherwise provided, and may, in such submission, *agree that a judgment of any circuit court shall be rendered upon the award made pursuant to such submission.*

> (2) A provision in a written contract to settle by arbitration under this chapter, a controversy thereafter arising between the parties to the contract, with relation thereto, and in which it is agreed

6

that *a judgment of any circuit court may be rendered upon the award made pursuant to such agreement*, shall be valid, enforceable and irrevocable save upon such grounds as exist at law or in equity for the rescission or revocation of any contract. Such an agreement shall stand as a submission to arbitration of any controversy arising under said contract not expressly exempt from arbitration by the terms of the contract. Any arbitration had in pursuance of such agreement shall proceed and the award reached thereby shall be enforced under this chapter. [MCL 600.5001 (emphasis added).]

MCL 600.5011 divests parties of the power to unilaterally revoke agreements made pursuant to MCL 600.5001. It provides:

Neither party shall have power to revoke *any agreement or submission made as provided in this chapter without the consent of the other party*; and if either party neglects to appear before the arbitrators after due notice, the arbitrators may nevertheless proceed to hear and determine the matter submitted to them upon the evidence produced by the other party. The court may order the parties to proceed with arbitration. [Emphasis added.]

MCL 600.5025 provides:

Upon the making of an agreement described in section 5001, the circuit courts have jurisdiction to enforce the agreement and to render judgment on an award thereunder. The court may render judgment on the award although the relief given is such that it could not or would not be granted by a court of law or equity in an ordinary civil action.

Because MCL 600.5001(1) applies to agreements made when there is an existing controversy between the parties, it covers agreements to arbitrate that are made after a cause of action has accrued. By contrast, MCL 600.5001(2) covers agreements to arbitrate causes of action that have yet to accrue.

The agreement in this case falls under MCL 600.5001(2), because that statute covers unaccrued claims. The agreement meets the first requirement of

7

MCL 600.5001(2) because it is in writing. But, the agreement does not provide that a judgment of any circuit court may be rendered upon the award. Therefore, it does not qualify under MCL 600.5001(2) as an agreement providing for statutory arbitration, and it is not enforceable under MCL 600.5011 or MCL 600.5025.

COMMON-LAW ARBITRATION

When the parties' agreement to arbitrate does not comply with the requirements of MCL 600.5001, the parties are said to have agreed to a common-law arbitration. *Frolich, supra* at 429. What characterizes common-law arbitration is its unilateral revocation rule. 4 Am Jur 2d, Alternative Dispute Resolution, § 94, p 148. This rule allows one party to terminate arbitration at any time before the arbitrator renders an award.

Although this Court first used the term "common law arbitration" as long ago as 1852,[1] it was not until 1890 that we specifically stated:

> It is conceded that an agreement to submit all matters in controversy between parties to arbitration, and thus oust courts of their jurisdiction, is void, and may be repudiated by either party at any time before award is made. [*Chippewa Lumber Co v Phenix Ins Co*, 80 Mich 116, 120; 44 NW 1055 (1890) (emphasis deleted).][2]

---

[1] *Clement, supra*.

[2] The Court's use of "conceded" indicates that this was settled law in 1890 despite the nonappearance of the rule in any opinion by this Court before *Chippewa*. This is further shown by the decisions cited from other jurisdictions in *Chippewa* such as *President, Managers & Co of Delaware & Hudson Canal Co v Pennsylvania Coal Co*, 50 NY 250 (1872), in which the New York Court of Appeals stated:

(continued…)

8

The *Chippewa* Court held that, when a common-law arbitration agreement

exists solely as a condition precedent to filing suit, it does not divest the courts of

jurisdiction. Therefore, it is valid and will be enforced. *Id.* at 121-122, citing

*Stephenson v Piscataqua Fire & Marine Ins Co*, 54 Me 55 (1866).[3] This Court

has not changed the unilateral revocation rule since it decided *Chippewa* in 1890.

---

(…continued)

> [T]he rule that a general covenant to submit any differences
> that may arise in the performance of a contract, or under an
> executory agreement, is a nullity, is too well established to be now
> questioned . . . . [*Id.* at 258.]

[3] We disagree with the Court of Appeals dicta in *Hetrick v David A Friedman*, *DPM, PC,* 237 Mich App 264, 273; 602 NW2d 603 (1999), that *Chippewa's* discussion of the revocation rule is dicta. "Dicta" is defined as follows:

> "'Statements and comments in an opinion concerning some
> rule of law or legal proposition not necessarily involved nor essential
> to determination of the case in hand, are, however illuminating, but
> *obiter dicta* and lack the force of an adjudication.'" [*Rowe v
> Montgomery Ward & Co*, *Inc,* 437 Mich 627, 719 n 101; 473 NW2d
> 268 (1991) (Levin, J., dissenting), quoting *Hett v* Duffy, 346 Mich
> 456, 461; 78 NW2d 284 (1956), quoting a headnote from People *v
> Case*, 220 Mich 379; 190 NW 289 (1922).]

The issue presented in *Chippewa* was whether the arbitration agreement between the parties was enforceable. Thus, a statement of the law regarding the enforceability of a common-law arbitration agreement was necessary to the determination of the case. Therefore, it is not dicta.

We also disagree with the Court of Appeals dicta in *Hetrick, supra,* that *Norton v Hayden,* 109 Mich 682; 67 NW 909 (1896), contradicts *Chippewa*. In *Norton*, the issue presented to the Court was whether the "making and delivery of an award [was] a condition precedent to the right of action[.]" *Id.* at 684. The plaintiff argued that, just because the agreement was a common-law arbitration, it was revocable at any time. *Id.* at 685. The Court disagreed and stated, "We must construe the parties contract as the parties have made it." *Id*. Viewed in isolation,

(continued…)

9

PREEMPTION

Given that we have long recognized common-law arbitration in Michigan, the next question is whether the Legislature preempted it when it enacted the MAA.

The common law, which has been adopted as part of our jurisprudence, remains in force until amended or repealed. Const 1963, art 3, § 7. Whether a statutory scheme preempts, changes, or amends the common law is a question of legislative intent. *Millross v Plum Hollow Golf Club*, 429 Mich 178, 183; 413 NW2d 17 (1987), citing *Jones v Rath Packing Co*, 430 US 519; 97 S Ct 1305; 51 L Ed 2d 604 (1977). In *Millross* we observed:

> In general, where comprehensive legislation prescribes in detail a course of conduct to pursue and the parties and things affected, and designates specific limitations and exceptions, the Legislature will be found to have intended that the statute supersede and replace the common law dealing with the subject matter. [*Millross, supra* at 183, citing 2A Sands, Sutherland Statutory Construction (4th ed), § 50.05, pp 440-441.]

Michigan courts have uniformly held that legislative amendment of the common law is not lightly presumed. *Marquis v Hartford Accident & Indemnity (After Remand),* 444 Mich 638, 652 n 17; 513 NW2d 799 (1994). In interpreting

---

(…continued)

the statement appears to contradict *Chippewa*. However, on closer reading, the Court is merely stating that it must interpret the contract to determine if the parties made arbitration a condition precedent to bringing an action at law. The *Chippewa* Court held that agreements are enforceable in which arbitration is a condition precedent to bringing an action at law. Therefore, *Norton* is consistent with *Chippewa's* holding.

10

statutory language, courts must determine and give effect to the intent of the Legislature. *In re MCI Telecom Complaint,* 460 Mich 396, 411; 596 NW2d 164 (1999). The first step in ascertaining legislative intent is to look at the words of the statute itself. *House Speaker v State Admin Bd,* 441 Mich 547; 495 NW2d 539 (1993).

In this case, the language of the MAA does not show an intention to abrogate common-law arbitration. It merely sets out guidelines indicating when agreements to arbitrate will be enforced.

Statutory and common-law agreements to arbitrate have long coexisted. 2 Michigan Law & Practice, 2d, Arbitration § 1, p 504, citing *Siller, supra. Frolich, supra,* clarifies that statutory and common-law arbitrations coexist. Nothing in the MAA indicates that the Legislature intended to change this existing law.

The Legislature is presumed to know of the existence of the common law when it acts. *Bennett v Weitz*, 220 Mich App 295, 299; 559 NW2d 354 (1996). When wording the MAA, the Legislature could easily have stated an intent to abrogate common-law arbitration.

Defendants argue that the scheme set forth in MCL 600.5001 clearly evidences the Legislature's intent to occupy the entire area of arbitration law. As previously observed, the MAA specifically covers two types of written agreements. MCL 600.5001(1) covers agreements to arbitrate a controversy that has already arisen, and MCL 600.5001(2) covers agreements to arbitrate possible future controversies. The statute does not refer to any other agreement, such as an

oral agreement to arbitrate, which could survive our statute of frauds.[4]  Moreover, the MAA explicitly removes from its purview arbitration agreements made pursuant to "collective contracts between employers and employees or associations of employees in respect to terms or conditions of employment." MCL 600.5001(3).

Also, importantly to this case, MCL 600.5011 specifically removes from its purview all agreements to arbitrate that do not conform to MCL 600.5001(1) or (2).  For instance, the agreement in this case does not conform to MCL 600.5001(2) and is unenforceable under the MAA.  Therefore, we conclude that the MAA, codified at MCL 600.5001 *et seq.,* does not occupy the entire area of arbitration law and does not preempt common-law arbitration in Michigan.

Parties wishing to conform an agreement to MCL 600.5001(2) must put it in writing and require that a circuit court may render judgment upon the award

---

[4] MCL 566.132 provides in relevant part:

> (1) In the following cases an agreement, contract, or promise is void unless that agreement, contract, or promise, or a note or memorandum of the agreement, contract, or promise is in writing and signed with an authorized signature by the party to be charged with the agreement, contract, or promise:

> (a) An agreement that, by its terms, is not to be performed within 1 year from the making of the agreement.

Many, if not all, agreements to arbitrate, by their terms, could be performed within one year from the making of the contract.  This is especially true under MCL 600.5001(1).  Therefore, the statute of frauds would not bar oral agreements to arbitrate that by their terms could be performed within one year of the making of the agreements.

made pursuant to the agreement. Otherwise, it will be treated as an agreement for common-law arbitration.

THE UNILATERAL REVOCATION RULE

Given that common-law arbitration exists in Michigan for agreements to arbitrate future controversies, we now turn to the question whether common-law arbitration agreements remain unilaterally revocable. The unilateral revocation rule was developed when courts were highly skeptical of arbitration. Many thought it to be against public policy for parties to divest the courts of jurisdiction. *E E Trip Excavating Contractor, Inc v Jackson Co*, 60 Mich App 221, 244; 230 NW2d 556 (1975).

Some courts have criticized the rule suggesting that this Court should exercise its powers to change the common law and eliminate the unilateral right to revoke. Specifically, an opinion and a concurrence from the Court of Appeals have asked this Court to clear the rule from this state's jurisprudence. *Hetrick, supra*; *Tony Andreski, Inc v Ski Brule, Inc,* 190 Mich App 343; 475 NW2d 469 (1991) (Griffin, P.J., concurring). The decision in *Hetrick* and the concurrence in *Andreski* argue that the rule is an atavistic vestige of the past, supported only by public policy arguments over 100 years old:

> "The heavily case-loaded courts are no longer jealous of their jurisdiction. Where the parties, by a fair agreement, have adopted a speedy and inexpensive means by which to have their disagreements adjusted, we see no public policy reasons for the courts to stand in their way. On the contrary we have a clear expression of public policy in the legislative enactments which provide for statutory

13

arbitration." [*Andreski, supra* at 350 (Griffin, P.J., concurring), quoting *E E Trip, supra* at 246–247.]

Nonetheless, we are unpersuaded that the time is ripe to change Michigan's common-law arbitration unilateral revocation rule. When the Legislature enacted the MAA, it created a method for binding arbitration that protects the rights of those who choose such arbitration. By not specifically abrogating the unilateral revocation rule, the Legislature chose to retain as well the protections that the rule offers. Parties entering into agreements to arbitrate future claims do not have full knowledge of what matters would be encompassed by the arbitration.

The unilateral revocation rule protects the right to bring suit when claims arise that a party did not anticipate and would not want handled outside the courts' direct protection. The Legislature has determined that public policy concerns do not require abrogation of the unilateral revocation rule, and we see no need to contravene that determination. See, e.g., *Lowe v Estate Motors Ltd,* 428 Mich 439, 467; 410 NW2d 706 (1987).

Second, the unilateral revocation rule leaves an option to parties entering into contracts in Michigan. As previously stated, parties agreeing to arbitrate claims that have not yet arisen may choose common-law arbitration specifically because of the unilateral revocation rule. The rule allows them flexibility in the event of a dispute. After a claim has arisen, the parties can arbitrate or not. If they prefer irrevocable arbitration, they can provide for it in their agreement or draft their agreement so that it provides for statutory arbitration.

Because of the long history and continuing utility of the unilateral revocation rule, we are unpersuaded of the need to overrule the rule. Hence, we affirm its existence as a useful part of Michigan jurisprudence.

## CONDUCT OF THE PARTIES

We conclude that the issue whether the arbitration agreement here became statutory arbitration because of the conduct of the parties during the arbitration process must be answered in the negative.

The change from the voluntary labor arbitration rules to the commercial dispute resolution procedures did not transform the parties agreement from a common-law arbitration agreement to a statutory arbitration agreement. The basic requirement of MCL 600.5001 *et seq.* that the agreement must be made in writing is not met in this case. It is true that the parties acquiesced in using the commercial dispute resolution procedures, but that does not change the fact that there is no written agreement containing the statutorily required language.

Under common-law arbitration, Wold had the right to withdraw from the arbitration process at any time until the arbitrator made an award. Therefore, Wold's unilateral revocation of the arbitration process was in conformity with its right under common-law arbitration and with the parties' agreement.

## CONCLUSION

We hold that common-law arbitration is not preempted by the Michigan arbitration act, MCL 600.5001 *et seq.*, and that common-law arbitration continues to exist in Michigan jurisprudence. Parties wishing to conform their agreements to

MCL 600.5001(2) must put their agreements in writing and require that a circuit court may enforce them.  Otherwise, their agreements will be treated as agreements for common-law arbitration.  In addition, common-law arbitration agreements continue to be unilaterally revocable before an arbitration award is made.  And the common-law arbitration in this case was not transformed into statutory arbitration because of the conduct of the parties during the arbitration process.

We affirm the decision of the Court of Appeals and remand this case to the trial court for further proceedings consistent with this opinion.

Marilyn Kelly
Clifford W. Taylor
Michael F. Cavanagh
Elizabeth A. Weaver
Stephen J. Markman

16

S T A T E   O F   M I C H I G A N

SUPREME COURT


WOLD ARCHITECTS and ENGINEERS,

    Plaintiff -Appellee,

v                                                                                  No. 126917

THOMAS STRAT and STRAT and
ASSOCIATES, INC.,

    Defendants-Appellants.

_____


CORRIGAN, J. (*concurring*).

I concur with the majority's decision to affirm the Court of Appeals determination that the trial court erred in granting defendants' motion for summary disposition and in denying plaintiffs' motion to vacate the arbitration award.  A majority of this Court has decided to retain the common-law rule that arbitration agreements are unilaterally revocable at any time.  Even if I were inclined to abrogate the unilateral revocation rule, a majority of this Court is not so inclined.  Thus, I commend this important policy choice to our Legislature.  I urge that body to examine whether it is prudent to retain the common-law unilateral revocation rule.  The common-law rule is rooted in an antiquated notion that arbitration is an inferior method of resolving disputes.  It undermines the well-established doctrine that parties enjoy the freedom to contract.

The unilateral revocation rule apparently originated in the statement of Lord Coke in *Vynior's Case*, 4 Coke, part VIII, 81b, 82a:

> For a man cannot by his act make such authority, power, or warrant not countermandable, which is by the law and of its own nature countermandable; as if I make a (a) letter of attorney to make a livery, or to sue an action, & c. in my name; or if I assign auditors to take an account; or if I made one my factor; or if I submit myself to an arbitrament; although these are made by express words irrevocable, or that I grant or am bound that all these shall stand irrevocably, yet they may be revoked.

This Court has referred to the unilateral revocation rule only in cases before the Legislature enacted the Michigan Arbitration Act (MAA), MCL 600.5001 *et seq*., and virtually always in confusing dicta. As the Court of Appeals explained in dicta in *Hetrick v David A Friedman, DPM, PC,* 237 Mich App 264, 272-275; 602 NW2d 603 (1999) (emphasis in original), this Court's jurisprudence regarding the rule has been inconsistent at best:

> Our Supreme Court's nineteenth century decisions *did not* consistently hold that common-law arbitration agreements are revocable whereas statutory agreements are not. In some cases, the Court at least suggested that *either type of arbitration* was revocable at the will of either party (which is arguably consistent with the nineteenth century statute, which did not provide that arbitration agreements were irrevocable). In *McGunn v Hanlin*, 29 Mich 475 (1874), the Court held that a common-law arbitration agreement that did not contain a covenant not to sue could not be enforced. *Id.*, 480. However, the Court expressly declined to consider "whether a *statutory* agreement, before the arbitrators have acted, stands on a different basis," thereby leaving the possibility that even statutory agreements were revocable. *Id.* In *Chippewa Lumber Co v Phenix Ins Co*, 80 Mich 116; 44 NW 1055 (1890), the Court broadly stated that arbitration agreements in general are unenforceable—without analysis, without reference to any arbitration statute, and without any distinction between statutory and common-law arbitration. *Id.*, 120.

2

Notwithstanding this sweeping declaration, the Court ultimately held that the parties' arbitration agreement—which utilized arbitration only as a condition precedent to filing a lawsuit—was enforceable.[6] *Id.*, 120-121. Because the Court ultimately enforced the limited arbitration agreement, its statement that an agreement to submit all matters to binding arbitration would have been unenforceable is dicta, not a binding statement of law.[1] *Edelberg v Leco Corp*, 236 Mich App 177; 599 NW2d 785 (1999). Moreover, because these cases blurred the distinction between common-law and statutory arbitration agreements, neither case warrants application of the unilateral revocation rule today, under the MAA.

\* \* \*

The Supreme Court implicitly rejected the unilateral revocation rule in *Frolich v Walbridge-Aldinger Co*, 236 Mich 425, 429; 210 NW 488 (1926). There, the Court stated that the parties' arbitration agreement was "not in conformity with our statutory requirements (3 Comp Laws 1915, § 13646 *et seq.*) and makes no reference to the act, *but in any event it is an agreement for a common-law arbitration.*" *Frolich, supra,* 429 (emphasis added). However, the Court *did not refuse to enforce the arbitration agreement on the ground that a common-law arbitration agreement was revocable by either party*. Instead, the Court held that the plaintiff was entitled to bring a lawsuit because the defendant failed to comply with the arbitration agreement by cooperating with the plaintiff's effort to arbitrate. *Id.*, 432. Indeed, it can be inferred from the *Frolich* decision that the Court would have enforced the parties' common-law arbitration agreement if the defendant had honored the terms of the agreement.

---

[1] The *Chippewa Lumber* Court held that the arbitration agreement was enforceable and not unilaterally revocable because the agreement made arbitration a condition precedent to bringing suit. *Chippewa Lumber, supra* at 120-122. This Court has similarly held in several other cases that an agreement containing a clause making arbitration a condition precedent to filing suit or rescission of the contract is enforceable and not unilaterally revocable. See, e.g., *Ripley v Lucas*, 267 Mich 682; 255 NW 356 (1934); *Baumgarth v Firemen's Fund Ins Co*, 152 Mich 479; 116 NW 449 (1908); *Norton v Hayden*, 109 Mich 682; 67 NW 909 (1896).

In *Siewek v F Joseph Lamb Co*, 257 Mich 670; 241 NW 807 (1932), the Court implicitly distinguished between statutory and common-law arbitration agreements, and stated that the latter were revocable *unless they came under one of two exceptions*: arbitration as condition precedent to a lawsuit, or arbitration relating to construction, paving, or installation contracts.[7] *Id.*, 676. Again, the Court's reliance on an obsolete statute and two obsolete exceptions renders its statement of the unilateral revocation rule irrelevant under the MAA and modern, proarbitration public policy.[2] *Rembert*[ *v Ryan Family Steak Houses, Inc*, 235 Mich App 118, 132-133; 596 NW2d 208 (1999)].

―――――――――――――――――――――――――――――――――――――

[6] Interestingly, the Court described this arbitration procedure as "*an expeditious, inexpensive, and proper method, if not a better one than is afforded by a suit.*" *Chippewa Lumber, supra*, 121 (emphasis added).

[7] See also *Detroit v A W Kutsche & Co*, 309 Mich 700, 708; 16 NW2d 128 (1944).

―――――――――――――――――――――――――――――――――――――

Thus, the common-law rule is not firmly entrenched in our jurisprudence, but is instead an aberration primarily based on conflicting case law and nonbinding dicta.

In 1961, our Legislature enacted the MAA, modeling it on the Uniform Arbitration Act, which requires the enforcement of arbitration agreements. MCL 600.5011. Since the enactment of the MAA, this case is the Court's first opportunity to consider the validity of the common-law unilateral revocation rule.

[2] Further, the *Siewek* Court's statement that "the general rule that a [common-law] arbitration agreement is not a bar to action" is dicta. *Siewek, supra* at 676.

While the Court of Appeals recognized the rule in *Tony Andreski, Inc v Ski Brule, Inc*, 190 Mich App 343, 350; 475 NW2d 469 (1991), and *E E Tripp Excavating Contractor, Inc v Jackson Co*, 60 Mich App 221, 243; 230 NW2d 556 (1975), these cases have been sharply criticized.[3]  In *Tony Andreski, Inc, supra* at 350-351, Judge Griffin dissented, expressing his disagreement with Michigan's "anachronistic" common-law rule.  The *Hetrick* panel thereafter criticized the rule and called for an end to it:

> The rule is the last vestige of that bygone judicial age when arbitration agreements were regarded as unlawful attempts to oust the courts of jurisdiction.  This rule serves no useful purpose today, particularly when the overwhelming public policy of this state favors arbitration to resolve a wide variety of disputes.  As this Court held in *Rembert, supra*, 133, "our Legislature and our courts have strongly endorsed arbitration as an inexpensive and expeditious alternative to litigation."  Indeed, even the *E E Tripp* Court, which revived the unilateral revocation rule for common-law arbitration, observed that judicial jealousy of arbitration had become obsolete. *E E Tripp Excavating Contractor, Inc, supra* at 246-247.  We see no reason to adhere to an antediluvian principle recited as dicta in the days of Ulysses S. Grant's presidency and Queen Victoria's reign.  We would therefore enforce common-law arbitration agreements on the same terms as any other contract, and consign the unilateral revocation rule to legal history's dustbin.  [*Hetrick, supra* at 276-277.]

I agree with Judge Griffin in his dissent in *Tony Andreski, Inc,* and with the *Hetrick* panel that the unilateral revocation rule appears to serve no purpose in today's proarbitration legal climate.  Even accepting the Court of Appeals

[3] Additionally, the *E E Tripp Excavating Contractor* panel did not apply the unilateral revocation rule because the defendant did not unambiguously manifest its intent to revoke the arbitration agreement. *Id.* at 249.

5

statement in *E E Tripp Excavating Contractor, supra* at 243, that "historically, common-law arbitration agreements could be revoked or repudiated at will by a party any time prior to announcement of the award," the purpose behind the rule is no longer valid. As our Court of Appeals has recognized, the unilateral revocation rule originated at a time when courts disfavored arbitration as an ouster of our jurisdiction over legal claims. See *Hetrick, supra* at 271 ("The origins of the unilateral revocation rule lie in the nineteenth century, when American law disfavored arbitration as second-rate justice at best, or an unlawful usurpation of judicial authority at worst."); *E E Tripp Excavating Contractor, supra* at 244 ("The most widely espoused justification for the rule is that specific enforcement of an arbitration agreement improperly ousts the courts of jurisdiction. Attempts by contract to foreclose judicial inquiry were against public policy.") As *E E Tripp Excavating Contractor, supra* at 244, noted, the most common policy arguments for the unilateral revocation rule are no longer relevant:

> Criticism of the unilateral revocation rule has mushroomed. . . .
>
> &ast; &ast; &ast;
>
> The heavily case-loaded courts are no longer jealous of their jurisdiction. Where the parties, by a fair agreement, have adopted a speedy and inexpensive means by which to have their disagreements adjusted, we see no public policy reasons for the courts to stand in their way. On the contrary we have a clear expression of public policy in the legislative enactments which provide for statutory arbitration.

6

In most states, the common-law rule permitting unilateral revocation of arbitration has been altered by statute. *La Stella v Garcia Estates, Inc*, 66 NJ 297; 331 A2d 1 (1975), citing 6 Williston, Contracts (rev ed, 1938), § 1920, Sturges, Commercial Arbitrations & Awards (1930), § 26, and Domke, The Law & Practice of Commercial Arbitration (1968), § 4.01. Many states have rejected or criticized the ouster and revocability doctrines that form the basis for the unilateral revocation rule. See, e.g., *IP Timberlands Operating Co, Ltd v Denmiss Corp*, 726 So 2d 96, 103-105 (Miss, 1998) (rejecting the ouster doctrine and expressly overturning "the former line of case law that jealously guarded the court's jurisdiction"); *Kaiser Foundation Health Plan of the Northwest v Doe*, 136 Or App 566, 577-579; 903 P2d 375 (1995) (holding that agreements to arbitrate may be specifically enforceable under common law and thus directing that judgment on an oral settlement incorporate the parties' agreement to arbitrate any remaining issues); *Wylie Independent School Dist v TMC Foundations, Inc*, 770 SW2d 19, 23 (Tex App, 1989) (holding that agreements to arbitrate future disputes are specifically enforceable on the basis of policy supporting alternative dispute resolution); *United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Industry v Stine*, 76 Nev 189, 202-214; 351 P2d 965 (1960) (rejecting the common-law rule that agreements to submit all disputes to arbitration were unenforceable, and ruling instead that an agreement to arbitrate a future dispute was valid and enforceable); *Rueda v Union Pacific R Co*, 180 Or 133, 166; 175 P2d 778 (1946) ("The rule that 'parties cannot stipulate beforehand to submit their rights generally to the

7

judgment of a designated third party for a final determination' is unsound. The rule that such agreements oust the courts of jurisdiction has an unworthy genesis, is fallacious in reasoning and has been followed merely because of ancient precedent."); *Hoboken M R Co v Hoboken R Warehouse & Steamship Connecting Co*, 132 NJ Eq 111, 117-119; 27 A2d 150 (1942) (explaining that New Jersey had not adopted the ouster doctrine and that arbitrator's decisions are enforceable); *Park Constr Co v Independent School Dist No 32*, 209 Minn 182, 184-189; 296 NW 475 (1941) (rejecting the notion that arbitration agreements "oust" courts of jurisdiction and overruling earlier decisions that general agreements to arbitrate are void as contrary to public policy); *Ezell v Rocky Mountain Bean & Elevator Co*, 76 Colo 409, 411-413; 232 P 680 (1925) (rejecting the argument that common-law agreements to arbitrate are void as being against public policy as attempts to oust the courts of jurisdiction, and holding that parties who contract to submit to common-law arbitration are bound by that contract).[4]

---

[4] The Harvard Negotiation Law Review has also urged courts to disavow the traditional unilateral revocation rule:

> It is not appropriate for a court to assume all ADR [alternative dispute resolution] agreements are unenforceable under antiquated "ouster" and "revocability" doctrines that traditionally precluded specific enforcement of pre-dispute agreements to arbitrate. Ouster theory proposed that parties cannot "oust" courts' power to resolve legal claims, and revocability condoned a party's unilateral revocation of an arbitration agreement. These doctrines have no solid basis. Nonetheless, some courts continue to apply them,
>
> (continued…)

Arbitration is now favored as an efficient, inexpensive, and fair method of resolving disputes. *Rembert, supra* at 127-133; see also *Port Huron Area School Dist v Port Huron Ed Ass'n*, 426 Mich 143, 150; 393 NW2d 811 (1986) ("It is well-settled that arbitration is a favored means of resolving labor disputes . . . ."); *Detroit v A W Kutsche & Co*, 309 Mich 700, 703; 16 NW2d 128 (1944) ("The general policy of this State is favorable to arbitration . . . .  If parties desire arbitration, courts should encourage them.")  The unilateral revocation rule does nothing to encourage arbitration other than convince parties aware of the rule that they have nothing to lose, because they can revoke the arbitration any time before the award.  Rather than encouraging parties aware of the rule to enter arbitration, the unilateral revocation rule discourages it by making arbitration an unreliable method of dispute resolution.  In today's legal climate, where arbitration is no

(…continued)
> perhaps due to judicial skepticism of private processes or resentment of the Supreme Court's seemingly pro-arbitration agenda.

> \*   \*   \*

> Courts should not . . . mask their concerns [regarding pro-arbitration policy] in espousals of antiquated ouster and revocability doctrines. These doctrines are based on faulty legal assumptions and misguided jealousies of private processes that threatened courts' domain.  [Schmitz, *Refreshing contractual analysis of ADR agreements by curing bipolar avoidance of modern common law*, 9 Harv Negotiation L R 1 (2004), pp 3-4, 28-29.]

See also 12 Corbin, Contracts (interim ed), § 1173, p 330 ("The earlier judicial attitude that regarded the specific enforcement of arbitration as too difficult or otherwise undesirable was already moribund and, by reason of both legislation and popular opinion, should be extinct.").

9

longer disfavored, but is an approved and trusted method to resolve disputes, Michigan should no longer countenance a rule that is grounded in distrust of arbitration and discourages parties from relying on arbitration.

Further, the rule tends to benefit those who are aware of it, such as lawyers and other sophisticated parties. It can be harmful to nonlawyers and less sophisticated parties who have no knowledge of the legal rule and are blindsided by it.[5] While the unilateral revocation rule exists, an unknowing party who enters an arbitration agreement may expend substantial amounts of time and money by participating in the arbitration process, only to have the other party revoke the agreement immediately before the arbitrator renders an award. The rule thus is a trap for the unwary. It discourages good-faith participants and leads to disillusionment of parties who are trapped by its application.

---

[5] The unilateral revocation rule is not common knowledge among laymen. Even research might not uncover the existence of the rule. For example, the American Arbitration Association's (AAA) "Beginner's Guide to Alternative Dispute Resolution" does not mention the unilateral revocation rule. Instead, the AAA guide merely explains that arbitration awards are final: "AAA arbitration awards are final, binding, and legally enforceable, subject only to limited review by the courts. Of course, parties may also agree in advance that awards will be advisory only." The AAA's "Drafting Dispute Resolution Clauses—A Practical Guide" states, "To be fully effective, 'entry of judgment' language in domestic cases is important." However, the guide does not warn a drafter of the possible consequences of omitting such a clause from the agreement. Thus, even if an unsophisticated party looks to the AAA guides, that party will not discover the existence of the unilateral revocation rule.

I dispute the majority's contention that parties entering into an arbitration agreement would be left without options without a unilateral revocation rule. Instead, I believe that the unilateral revocation rule undermines our contract doctrine by unfairly *limiting* the options available to contracting parties. This Court has stated that arbitration agreements are grounded in contract. *Arrow Overall Supply Co v Peloquin Enterprises*, 414 Mich 95, 98; 323 NW2d 1 (1982). "'[T]he arbitration promise is itself a contract. The parties are free to make that promise as broad or as narrow as they wish . . . .'" *Port Huron Area School Dist, supra* at 151 n 6, quoting *United Steelworkers v American Mfg Co*, 363 US 564, 570; 80 S Ct 1343; 4 L Ed 2d 1403 (1960) (Brennan, J., concurring). Thus, parties to an arbitration contract should be bound by the same contract principles as parties to any other contract. Under general contract principles, a valid contract is enforceable and may not be revoked unilaterally.[6] Unless a contract condition

---

[6] Indeed, this Court has reiterated on numerous occasions its commitment to enforcing unambiguous contracts as they are written. See, e.g., *Rory v Continental Ins Co*, 473 Mich 457, 491; 703 NW2d 23 (2005) ("Consistent with our prior jurisprudence, unambiguous contracts . . . are to be enforced as written unless a contractual provision violates law or public policy."); *Quality Products & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 380; 666 NW2d 251 (2003) ("Our obligation to respect and enforce the parties' unambiguous contract absent mutual assent to modify that contract precludes us from [permitting unilateral modification of the contract]."); *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 51; 664 NW2d 776 (2003) ("This approach, where judges divine the parties' reasonable expectations and then rewrite the contract accordingly, is contrary to the bedrock principles of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent some highly unusual circumstance, such as a contract in violation of law or public policy."); *Terrien v Zwit*, 467 Mich 56, 71; 648 NW2d 602 (2002), quoting *Twin*

(continued…)

11

causes a contract to be void or voidable, such as coercion or fraud, the terms of an arbitration agreement, like any other contract, should be upheld. The parties should not be required to include a provision specifically stating that the arbitration is irrevocable. The revocation rule limits the parties' freedom to contract by precluding them from entering a common-law agreement to arbitrate that would be enforceable and irrevocable.

Conversely, parties should also be free to include in their common-law arbitration agreement a clause allowing either party to unilaterally revoke the agreement. Thus, a decision to abrogate the unilateral revocation rule would not limit the options of contracting parties by creating a situation where common-law arbitration agreements could never be unilaterally revoked. The parties are limited only by the terms by which they themselves choose to be bound. Accordingly, I do not believe that the unilateral revocation rule is necessary to either protect the right to bring suit or provide parties flexibility in the event of a dispute.

In sum, I believe that the common-law rule allowing unilateral revocation of arbitration agreements is based on the outdated notions that arbitration is an

---

(…continued)
*City Pipe Line Co v Harding Glass Co*, 283 US 353, 356; 51 S Ct 476; 75 L Ed 1112 (1931) ("'The general rule [of contracts] is that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts.'"). These cases make clear that the unilateral revocation rule is an anomaly in our otherwise consistent case law affirming the freedom to contract and the enforceability of unambiguous agreements.

unfavorable means of resolving disputes and that arbitration ousts the courts of their rightful jurisdiction over disputes. The courts are no longer jealous of their jurisdiction, and arbitration is now a favored method of dispute resolution. The unilateral revocation rule has a questionable history in Michigan jurisprudence and has not been recognized by this Court since the Legislature enacted the MAA in 1961. Abrogation of the rule would not limit the options of parties entering arbitration agreements, but would instead encourage arbitration and allow parties the freedom to agree by contract to revocable or irrevocable arbitration as they see fit. Arbitration agreements are contracts and should be governed by the same contractual principles as other agreements. Therefore, I urge the Legislature to consider the wisdom of retaining the common-law unilateral revocation rule in its current form.

Maura D. Corrigan
Robert P. Young, Jr.
